# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **FELISHA R. COLLIER,** | ) | |
| Plaintiff | ) | Civil Action No. 2:21cv00039 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social** | ) | By:  Pamela Meade Sargent |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Felisha R. Collier, ("Collier"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there

is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Collier protectively filed her application for SSI[1] on October 30, 2019, alleging disability as of July 31, 2008, based on foot issues; back issues; seizures; facial nerve damage; kidney and bladder problems; and bipolar disorder. (Record, ("R."), at 15, 213, 240.) The claim was denied initially and upon reconsideration. (R. at 141-43, 147-49, 152-55, 157-58, 161-62.) Collier then requested a hearing before an administrative law judge, ("ALJ"). (R. at 164-65.) The ALJ held a hearing on April 6, 2021, at which Collier was represented by counsel. (R. at 34-68.)

By decision dated April 28, 2021, the ALJ denied Collier's claim. (R. at 15-28.) The ALJ found Collier had not engaged in substantial gainful activity since October 30, 2019, the application date. (R. at 17.) The ALJ determined that Collier had severe impairments, namely dysfunction, major joints; essential hypertension; hyperlipidemia; gastritis; hernias; disorders of female genital organs; seizures; anxiety; and depression, but he found Collier did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-20.)

---

[1] On October 8, 2015, Collier filed a prior application for SSI, alleging disability as of July 31, 2008. (R. at 78.) She amended her alleged onset date to October 8, 2015, at her hearing. (R. at 78.) By decision dated September 26, 2018, the ALJ denied Collier's claim. (R. at 78-93.) It appears from the record that Collier appealed this decision to the Appeals Council but no further. (R. at 237.)

The ALJ found that Collier had the residual functional capacity to perform light[2] work, except she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl and occasionally work around dust, odors, fumes and pulmonary irritants; never climb ladders, ropes or scaffolds, work at unprotected heights or around hazardous machinery and never operate a motor vehicle. (R. at 21.) The ALJ also found Collier was limited to simple, routine tasks involving simple, short instructions and simple decisions for two-hour segments; she required a low-stress work environment, defined as requiring only occasional workplace changes; she could not interact with the public, but could have occasional, superficial interaction with co-workers, with superficial defined as doing such things as telling the time of day or providing directions to the bathroom; and she could have occasional interaction with supervisors. (R. at 21.) The ALJ found Collier would be off task five percent of the time in an eight-hour workday in addition to normal breaks, and she would be absent from work one day monthly. (R. at 21.) The ALJ found Collier had no past relevant work. (R. at 26.) The ALJ found that, based on Collier's age, education, work history and residual functional capacity and the testimony of a vocational expert, a significant number of jobs existed in the national economy that Collier could perform, including the jobs of a marker, a router and a bagger. (R. at 26-27, 61-63.) Thus, the ALJ concluded Collier was not under a disability as defined by the Act since October 30, 2019, the application filing date. (R. at 27-28.) *See* 20 C.F.R. § 416.920(g) (2021).

After the ALJ issued his decision, Collier pursued her administrative appeals, (R. at 208, 300-01), but the Appeals Council denied her request for review. (R. at 1-5.) Collier then filed this action seeking review of the ALJ's unfavorable decision,

---

[2] Light work involves lifting items weighing up to 20 pounds with occasional lifting of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2021).

which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2021). This case is before this court on Collier's motion for summary judgment filed May 5, 2022, and the Commissioner's motion for summary judgment filed June 6, 2022.

## II. Facts

Collier was born in 1975, (R. at 213), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She has a high school education and previously worked as a certified nursing assistant, ("CNA"), but she has not worked since 2008. (R. at 241.) She testified she had a prior problem with alcohol, which she had not consumed in three or four years, and previously abused opiates, which she had not "touched … since 2015." (R. at 44-46.) Collier stated she used marijuana once every week or two for anxiety and panic attacks, as it "relaxe[d] [her] body," and Buspar and Vistaril did not control all of her panic attacks. (R. at 44-45.) Collier stated she was hospitalized multiple times in 2018 due to bipolar disorder, which had worsened since 2019. (R. at 45, 46.) She testified she had begun having panic attacks approximately twice weekly, requiring her to lie down for 30 to 45 minutes, and she stated she was "down" three to four days each week, during which she slept a good portion of the day. (R. at 47, 57.) Collier also testified she had crying spells and irritability. (R. at 57-58.) She reported she began having sodium and potassium issues in 2020, which required her to adjust her seizure medication, resulting in increased seizures. (R. at 47-48.) Collier stated that, since a hospitalization in February 2020, she had no energy and would fall asleep if she sat for a couple of minutes. (R. at 50.) She also testified she suffered a stroke earlier in 2021, which might have been related to her potassium levels, and which resulted in left-sided weakness, double vision in both eyes, depth perception issues and difficulty gripping and grasping. (R. at 49, 51-52.) Collier testified she also had long-standing problems

with her left ankle due to a motor vehicle accident, and she reported ankle pain and swelling, which had caused her to fall. (R. at 54.) She said she treated her ankle with Flexeril, a topical cream, heat and ice. (R. at 54-55.) However, Collier testified her most significant pain was in her lower back, which radiated all the way down her left side. (R. at 55.)

Collier testified she was unable to perform normal activities of daily living, like house cleaning and light household chores, stating her daughter did all the cooking, laundry and mopping. (R. at 51.) She stated she could stand and walk for up to 20 minutes before her ankle would become painful and tired, giving out and causing her to fall. (R. at 55.) Collier testified she could not sit for extended periods due to restless leg syndrome, as well as back pain, estimating she could sit in one position for about 20 minutes. (R. at 55-56.) She testified she could not use her left hand for lifting/carrying; she could lift a gallon of milk with the right hand; and she had to use both hands to pour a drink. (R. at 52, 56.) Collier testified she was unable to use her right hand and arm at table top or chest level, as they would "get[] weak and … start[] jerking." (R. at 53.) She also said she could not perform overhead activities with her hands and arms because she would drop items. (R. at 53-54.) Collier testified she began having problems with her hands in 2019. (R. at 60.)

In rendering his decision, the ALJ reviewed records from Dr. Bert Spetzler, M.D., a state agency physician; William Carne, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; Holston Valley Medical Center, ("Holston Valley"); Norton Community Hospital; Clearview Center, ("Clearview"); Bristol Regional Medical Center, ("Bristol Regional"); Wellmont Health System; Frontier Health; Wise County Behavioral Health Services; Johnston Memorial Diabetes Care Center; Woodridge Hospital, ("Woodridge"); Mountain View Regional Medical Center,

("Mountain View"); BHMA Diabetes and Endocrinology – Abingdon; Dr. Lauren Burns, D.O.; Ballad Health Medical Associates; CVA Heart Institute; BHMA Family Medicine; and Southwest Virginia Cancer Center.

### A. Mental Impairments

By way of background, Collier was emergently psychiatrically hospitalized at Woodridge on September 11, 2007, due to depression and suicidal ideations, with a plan to overdose on pills. (R. at 1634.) At that time, she was having numerous stressors, including marital issues,[3] child custody issues and dealing with an incarcerated boyfriend. (R. at 1634.) Collier was placed on safety protocols and detoxification protocols, given a history of alcohol dependence.[4] (R. at 1634.) Dr. Maria T. M. Liquete, M.D., noted that Collier's described symptoms might be consistent with bipolar disorder. (R. at 1634.) After stabilizing on medications and showing improvement in mood, Collier was discharged on September 17, 2007, with diagnoses of major depressive disorder, rule out bipolar disorder; and personality disorder, not otherwise specified, and Dr. Liquete prescribed Paxil, Seroquel and Trazodone. (R. at 1634-35.)

Collier received mental health treatment at Frontier Health as early as September 2, 2015. At that time, she reported a psychiatric hospitalization in 2012.[5]

---

[3] Collier stated she and her husband were separated, but he would not give her a divorce. (R. at 1637.)

[4] At the time of hospitalization, Collier reported drinking one fifth or more of whiskey per day for the prior six weeks. (R. at 1636.)

[5] While these treatment notes are not contained in the record, the ALJ's September 2018 decision states that Collier had a voluntary inpatient admission in October 2012 and reported that things had been "good" since leaving at her follow-up visit. (R. at 87.) At that time, her provider noted her mood was happy, speech was clear, she was appropriately dressed, and she made good eye contact. (R. at 87.)

(R. at 785.) Collier stated she requires hospitalization only when her medications stop working. (R. at 785.) According to Collier, she was incarcerated for 14 months on conspiracy and distribution charges, having been released on August 17, 2015. (R. at 785.) She said her medications, which were changed while incarcerated, were not working, and she asked to be referred there to resume her prior medications.[6] (R. at 785.)

Collier again was psychiatrically hospitalized at Clearview on May 21, 2018, after attempting suicide by inhaling aerosol from canned air used for computer cleaning. (R. at 414.) At that time, it was noted she had undergone prior treatment for bipolar disorder. (R. at 414.) Collier also had undergone recent medication adjustments, with which she had not been compliant. (R. at 414.) She noted some increased family stressors. (R. at 414.) Collier was treated with Seroquel, Vistaril, gabapentin and doxepin. (R. at 415.) Her symptoms and mood improved, and at the time of discharge on May 30, 2018, she had no suicidal or homicidal ideation and no psychosis. (R. at 415.) Her mental status at discharge was, otherwise, normal. (R. at 415-16.) Collier's diagnoses included bipolar affective disorder – depressed; generalized anxiety disorder; unspecified cannabis use disorder; and history of opiate abuse disorder, in remission. (R. at 414.) She was prescribed Seroquel, Vistaril, gabapentin and doxepin. (R. at 415.)

Collier was hospitalized at Ridgeview on a temporary detention order from June 19 through June 28, 2018, after overdosing on Percocet.[7] (R. at 494, 923.) At

---

[6] Specifically, Collier requested to be prescribed Topomax, doxepin, Zyprexa, Tegretol and Paxil. (R. at 785.)

[7] Collier initially presented to the emergency department at Mountain View on June 18, 2018, with complaints, including anxiety, depression, panic attacks and suicidal ideation. (R. at 914.) She received Ativan, and a psychiatric consult determined she was unable to be evaluated

discharge, she was diagnosed with bipolar I disorder, current episode mixed, and she was deemed to be in stable condition. (R. at 496.)

Collier saw Celeste Mullins, F.N.P., a family nurse practitioner at Frontier Health, on October 1, 2018, for medication management, noting, among other things, that she and her boyfriend had been camping, and she had been doing well collecting and selling mushrooms. (R. at 820.) On November 26, 2018, Collier reported hiking, picking mushrooms and crocheting for leisure. (R. at 1285.) Likewise, on February 27, 2019, Collier reported hiking and crocheting. (R. at 1294.) On May 13, 2019, she stated she and her boyfriend continued to spend a lot of time outdoors, hiking, camping, biking, fishing and looking for herbs, and she continued to crochet. (R. at 838, 1300.)

On September 23, 2019, Collier saw Amy Livingston, B.S., a case manager at Frontier Health, reporting she was "doing good," but having some family stressors. (R. at 1304.) She reported she had stopped smoking. (R. at 1304.) Her mental status was normal, except for having a happy/anxious mood, with a congruent affect. (R. at 1304.) Livingston stated Collier was "maintaining" at that time. (R. at 1304.) Collier did not show for her Abilify injection the following day. (R. at 1238.) On November 4, 2019, Mullins noted Collier had taken leftover Abilify tablets in lieu of receiving the Abilify injections in September and October, and she wished to continue this medication. (R. at 852.) She admitted to occasional alcohol and cannabis use. (R. at 852.) She said she was staying busy with outdoor activities and hiking/camping, but she relayed continued situational stressors with her daughters. (R. at 852.) Collier denied hallucinations and suicidal or homicidal ideations. (R. at 852.) Her mental status, again, was normal. (R. at 853-54.) Mullins diagnosed

---

due to possible drug intoxication. (R. at 916-17.) Collier was admitted to the ICU for observation and for medical clearance for mental health evaluation. (R. at 918.)

Collier with alcohol use disorder, severe; cannabis use disorder, mild; opioid use disorder, severe; and unspecified bipolar and related disorder, and she restarted Abilify. (R. at 852, 855.) Collier did not show for her appointment on December 23, 2019. (R. at 1239.) On January 27, 2020, it was noted Collier had missed more than three scheduled appointments that month, and an appointment was scheduled for January 28, 2020. (R. at 1305.) However, on January 27, 2020, Collier called with some "concerns," requesting to speak with a supervisor. (R. at 1306.) Tracy Anderson, R.N., QMHP, unsuccessfully attempted to reach Collier three times that day, and left her a voice mail the following day. (R. at 1306-07.)

On September 23, 2019, Collier saw Nicholas J. Sluss, P.A., a physician assistant at Wellmont Medical Associates, denying suicidal ideation, and she was neither nervous/anxious nor hyperactive. (R. at 766.) Collier was alert and fully oriented, with a normal mood and affect, normal speech, behavior, judgment, thought content, cognition and memory. (R. at 766.) It was noted Collier's mixed bipolar II disorder with rapid cycling was controlled and that she continued to see behavioral health. (R. at 767.) Collier saw Dr. Lauren Burns, D.O., a physician at Wellmont Medical Associates, on December 20, 2019, at which time she was alert and fully oriented, with a normal mood and affect, normal behavior, judgment and thought content. (R. at 880.) When Collier returned to Dr. Burns on January 16, 2020, she denied alcohol use, but admitted to marijuana use, within the prior 12 months. (R. at 875.) Collier reported being nervous/anxious and having increased stress at home, but on examination, she was alert and fully oriented, with a normal mood and affect, normal behavior, judgment and thought content. (R. at 875-76.) When Collier saw Dr. Burns on January 30, 2020, she was, again, alert and fully oriented, with a normal mood, affect, behavior, judgment and thought content. (R. at 1452.) She was hospitalized from February 1 through February 3, 2020, for

hyponatremia.[8] (R. at 1445-46.) One of her discharge diagnoses was bipolar I disorder. (R. at 1445-46.) These notes reveal that Collier's Trileptal had been discontinued at a recent prior hospitalization, as it was felt to be a contributing factor to the hyponatremia. (R. at 1445.) Her Trileptal was restarted at a lower dosage. (R. at 1446.) Mental status examination at discharge showed normal speech, linear thoughts and good eye contact. (R. at 1447.) Her medications at discharge included Trileptal, Abilify injection, doxepin, Prozac and Vistaril. (R. at 1446-47.) However, when Collier saw Dr. Burns on February 6, 2020, she stated she was off Trileptal, and she was very emotional since stopping it. (R. at 1428.) Collier also stated she was off Abilify because she ran out of it, and she needed a Prozac refill. (R. at 1428.) On mental status examination, she was alert and fully oriented, with a normal mood, affect, behavior, judgment and thought content. (R. at 1431.) Dr. Burns diagnosed bipolar disorder, among other things, and she prescribed Seroquel, refilled Prozac and increased Collier's Abilify dosage. (R. at 1432.) On February 17, 2020, Collier advised Dr. Burns she was compliant with her medications and that her mood was good since stopping Trileptal. (R. at 1422.) She requested a referral to a psychiatrist/psychologist for her disability claim. (R. at 1422.) Collier remained alert and fully oriented, with a normal mood, affect, behavior, judgment and thought content. (R. at 1425.) Dr. Burns deemed Collier's bipolar disorder to be stable, and she referred her to Dr. Ehtesham.[9] (R. at 1427.)

William Carne, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on February 15, 2020, in connection with the

---

[8] Hyponatremia refers to a deficiency of sodium in the blood. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 806 (27th ed. 1988).

[9] There are no notes from Dr. Ehtesham contained in the record.

initial determination of Collier's SSI claim, finding she was mildly[10] limited in her ability to understand, remember or apply information and to adapt or manage herself; and moderately[11] limited in her ability to interact with others and to concentrate, persist or maintain pace. (R. at 105-06.) Carne opined Collier could learn and perform one- to two-step commands with occasional contact with the public and with co-workers in a low-stress environment. (R. at 106.) Carne noted that, although Collier was diagnosed with and treated for depression, anxiety and substance abuse, her activities of daily living did not appear to be severely limited, as evidenced by the fact she lived with her boyfriend, visited her children who lived with their father in North Carolina, hiked, was able to perform personal care and kept appointments with her primary care and mental health providers, with overall normal examinations. (R. at 106, 111.) Carne also completed a mental residual functional capacity assessment the same day, finding Collier was moderately limited in her ability to understand, remember and carry out detailed instructions; to work in coordination with or in proximity to others without being distracted by them; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to travel in unfamiliar places or use public transportation. (R. at 109-11.) In all other areas, Collier was deemed not significantly limited. (R. at 109-11.)

On February 25, 2020, when Collier saw Dr. Matthew Beasey, M.D., an endocrinologist at BHMA Diabetes and Endocrinology – Abingdon, she denied

---

[10] The regulations define a mild limitation as a slight limitation on a claimant's functioning, independently, appropriately, effectively and on a sustained basis. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (F)(2)(b) (2021).

[11] The regulations define a moderate limitation as one resulting in fair functioning, independently, appropriately, effectively and on a sustained basis. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2021).

anxiety and depression, and on examination, she was alert and fully oriented. (R. at 1407.) Among Dr. Beasey's diagnoses was bipolar disorder. (R. at 1407.)

On July 16, 2020, Joseph Leizer, Ph.D., a state agency psychologist, completed a PRTF, in connection with the reconsideration of Collier's SSI claim, which mirrored that of Carne. (R. at 124-25.) He opined Collier could perform simple work. (R. at 125.) Leizer also completed a mental residual functional capacity assessment on that day, in which he opined Collier was moderately limited in all the abilities as Carne had found previously, but Leizer additionally found Collier was moderately limited in the following abilities, as well: to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. (R. at 129-31.) In all other areas, Collier was deemed not significantly limited. (R. at 129-31.) Leizer concluded she could perform simple/routine tasks. (R. at 131.)

Collier continued to treat with Dr. Burns from May 13, 2020, through February 25, 2021. At each of her eight appointments over this time, she was alert and oriented with a normal mood, affect, behavior, judgment and thought content. (R. at 1585, 1590, 2033, 2046, 2053, 2060, 2068, 2076.) Dr. Burns completed a mental assessment of Collier on March 3, 2021, finding she had no or minimal limitations in her ability to understand, remember and carry out simple job instructions; a slight limitation in her ability to function independently, to understand, remember and carry out detailed job instructions and to maintain personal appearance; a satisfactory ability to follow work rules, to relate to co-workers, to use judgment in public, to interact with supervisors, to maintain

-12-

attention/concentration, to understand, remember and carry out complex job instructions and to demonstrate reliability; a marked, or seriously limited, ability, resulting in unsatisfactory work performance, in dealing with the public, behaving in an emotionally stable manner and relating predictably in social situations; and no useful ability to deal with work stresses. (R. at 2008-10.) Dr. Burns found Collier would be absent from work more than two days monthly. (R. at 2010.) She based these findings on Collier's bipolar disorder with episodic mood flares, as well as her difficulty with memory, thought and concentration due to a recent stroke. (R. at 2009-10.)

When Collier saw an oncologist/hematologist on March 24, 2021, she indicated on a depression scale that she did not have little interest or pleasure in doing things and that she did not feel down, depressed or hopeless. (R. at 2119.) On mental status examination, Collier was alert and fully oriented, with a normal mood, affect, behavior, judgment and thought content. (R. at 2120.)

### B. Physical Impairments

By way of background, Collier presented to the emergency department on August 11, 2018, with complaints of severe left leg pain after falling down a small hill while hiking. (R. at 903.) A CT scan of Collier's left lower extremity, dated August 12, 2018, showed old, surgically repaired remote bimalleolar fractures without evidence of an acute fracture, as well as soft tissue swelling about the mid-fibula. (R. at 983-84.) She was diagnosed with a left leg contusion, she was given crutches, and she was advised to take over-the-counter pain medication. (R. at 905.) When Collier followed up with Sluss on August 15, 2018, she reported continued moderate pain, aggravated by walking and standing. (R. at 898.) X-rays of her left ankle from that date showed no acute fracture or subluxation, her hardware appeared

stable, and there was no soft tissue swelling. (R. at 983.) She was diagnosed with left foot pain. (R. at 902.)

A pelvic ultrasound, dated October 25, 2018, showed a diffusely thickened endometrium, which could represent residual hyperplasia, endometriosis or endometrial cancer, and a follow up was recommended. (R. at 1097.) Collier saw Dr. Rubye Washington-Moore, M.D., at Community Physicians Norwise, on April 3, 2019, with complaints of dysfunctional uterine bleeding, symptomatic uterine fibroids and dysmenorrhea. (R. at 1064.) She underwent a hysteroscopy, dilation and curettage and ablation on April 15, 2019. (R. at 1065, 1071.) Pathology was negative for endometriosis, hyperplasia and malignancy. (R. at 1069.)

On February 14, 2019, a drug screen was positive for marijuana, and lab work indicated low sodium and calcium levels. (R. at 1077-78.) An EKG, dated April 11, 2019, indicated sinus bradycardia, as well as a septal myocardial infarction of indeterminate age. (R. at 1076.) However, chest x-rays from the same date showed no acute cardiopulmonary disease. (R. at 1075.)

When Collier returned to Sluss on September 23, 2019, for a routine follow up, an examination was largely normal, except for decreased range of motion, tenderness and pain of the lumbar back. (R. at 884.) However, she had normal strength and reflexes, no cranial nerve deficit and no sensory deficit. (R. at 884.) On December 20, 2019, Collier saw Dr. Burns, reporting medication compliance with stability. (R. at 878.) A physical examination was normal. (R. at 880.) Dr. Burns found Collier's GERD to be stable, but, because Zantac had been recalled, she prescribed Pepcid. (R. at 881.) On January 16, 2020, Collier returned to Dr. Burns with complaints of hypertension and headache. (R. at 873.) On examination, she had mild, bilateral leg swelling, but no tenderness or deformity. (R. at 876.) The

remainder of the examination was normal. (R. at 876.) Dr. Burns prescribed Losartan for hypertension and advised her to monitor her blood pressure. (R. at 877.) She increased her Protonix dosage for GERD symptoms. (R. at 877.) Dr. Burns noted Collier had persistent hyponatremia, possibly secondary to doxepin and Trileptal usage, and she prescribed sodium chloride tablets. (R. at 877.)

On January 22, 2020, Collier presented to the emergency department at Norton Community Hospital with complaints of vomiting, headache, dizziness and chills for four days, after having begun Losartan four days previously. (R. at 1034, 1055.) She reported her most recent seizure was more than a year previously. (R. at 1034.) A CT scan of her head showed no acute intracranial process, but lab work showed low sodium and potassium levels, and Collier was hospitalized with diagnoses of hyponatremia and hypokalemia.[12] (R. at 1056, 1061.) The following day, Collier was asymptomatic after her fluids were restricted. (R. at 1057.) She was discharged on January 24, 2020, in improved and stable condition, with diagnoses of polydipsia[13] and hyponatremia, and she was instructed to restrict her fluid intake. (R. at 1031, 1052, 1063.) It also was noted Collier might need to increase her dietary sodium. (R. at 1063.) Losartan was discontinued, and her metoprolol dosage was decreased. (R. at 1032.) Physical examination at discharge was normal. (R. at 1057.)

Dr. Bert Spetzler, M.D., a state agency physician, completed a physical residual functional capacity assessment of Collier on February 19, 2020, in

---

[12] Hypokalemia refers to abnormally low potassium concentration in the blood. It may result from potassium loss by renal secretion or by the gastrointestinal route, as by vomiting or diarrhea. It may be manifested clinically by neuromuscular disorders ranging from weakness to paralysis, by electrocardiographic abnormalities (depression of the T wave and elevation of the U wave), by renal disease and by gastrointestinal disorders. *See* Dorland's at 805.

[13] Polydipsia refers to chronic, excessive thirst as in diabetes mellitus or diabetes insipidus. *See* Dorland's at 1330.

connection with the initial determination of her SSI claim, finding she could occasionally lift/carry 50 pounds and frequently lift/carry 25 pounds; stand/walk a total of six hours in an eight-hour workday; sit a total of six hours in an eight-hour workday; and push/pull up to the lift/carry restrictions. (R. at 107-09.) Dr. Spetzler found Collier could frequently balance, stoop, kneel, crouch and crawl; occasionally climb ramps and stairs; and never climb ladders, ropes or scaffolds. (R. at 108.) He found she should avoid concentrated exposure to noise, vibration, fumes, odors, dusts, gases and poor ventilation and hazards, such as machinery and heights. (R. at 109.) Dr. Spetzler imposed no manipulative, visual or communicative limitations. (R. at 108.)

Collier called Dr. Burns's office on March 10, 2020, requesting a doxepin refill, stating she had been out for a week and unable to sleep. (R. at 1596.) Dr. Burns, however, prescribed Elavil, due to Collier's chronic hyponatremia. (R. at 1596.) When Collier called Dr. Burns's office on April 30, 2020, stating she was continuing to have trouble sleeping, her dosage of Seroquel was increased. (R. at 1593.) On May 8, 2020, Collier had a telephonic appointment with Dr. Burns, reporting having a tick embedded in her neck for at least two days after going fishing. (R. at 1592.) She said the area swelled, had a knot and a black dot in the middle of it, but there was no bullseye rash. (R. at 1592.) She also began to have some slight headaches. (R. at 1592.) Collier reported compliance with her anti-hypertensive medication regimen. (R. at 1592.) Dr. Burns prescribed an antibiotic and scheduled a follow-up appointment for the next week. (R. at 1593.) When Collier saw Dr. Burns on May 13, 2020, her blood pressure was "at goal" at 118/80, and she reported medication compliance. (R. at 1587.) She also reported Seroquel was helping her sleep, and she no longer thought she needed Elavil, which was causing restless legs. (R. at 1587.) Collier reported she continued to take sodium chloride tablets for hyponatremia, and her symptoms had resolved. (R. at 1587.) She also noted doxepin

and Trileptal had been discontinued, which could have been contributory. (R. at 1587.) Collier's physical examination findings were completely normal. (R. at 1589-90.) Dr. Burns deemed Collier's hypertension stable and continued her on Cozaar; she discontinued Elavil, but continued Seroquel for bipolar disorder and insomnia; she ordered lab work for hyponatremia; and she continued holding doxepin and Trileptal. (R. at 1591.)

On June 11, 2020, Collier saw Dr. Beasey for a follow up regarding her hyponatremia. (R. at 1893.) He noted Collier began having increased issues with low sodium in January 2020. (R. at 1893.) Dr. Beasey stated that her only symptom was dizziness, which had improved since stopping Trileptal. (R. at 1893.) Collier's physical examination was normal. (R. at 1898.)

On July 16, 2020, Dr. Robert McGuffin, M.D., a state agency physician, completed a physical residual functional capacity assessment in connection with the reconsideration of Collier's SSI claim, finding she could lift/carry 20 pounds occasionally; 10 pounds frequently; stand/walk a total of six hours in an eight-hour workday; sit a total of six hours in an eight-hour workday; and push/pull up to the lift/carry restrictions. (R. at 127-29.) He found Collier could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds. (R. at 127-28.) Dr. McGuffin found Collier should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation; and she should avoid even moderate exposure to hazards, such as machinery and heights. (R. at 128.) He imposed no manipulative, visual or communicative limitations. (R. at 128.) Dr. McGuffin opined Collier could perform light work. (R. at 129.)

On August 13, 2020, Collier advised Dr. Burns of having two seizures in the previous three months, but she denied significant issues stemming from her seizures.

(R. at 2029.) She inquired if her Neurontin dosage needed to be increased. (R. at 2029.) Collier's blood pressure was "at goal" at 132/82, and she reported medication compliance. (R. at 2029, 2032.) She reported she had begun to have some low back pain/spasm after working outside. (R. at 2029.) A physical examination was normal, except for decreased range of motion of the lumbar back with pain and spasm, and her sodium level was in normal range. (R. at 2033-34.) Dr. Burns diagnosed seizure disorder and restarted Collier on a low dose of Trileptal. (R. at 2035.) She continued Collier's current Neurontin dose and current hypertension regimen, and she advised a trial of conservative management, including anti-inflammatory foods, use of non-steroidal anti-inflammatory drugs, as needed, stretching and heat for Collier's back pain. (R. at 2035.) On August 17, 2020, Collier returned with complaints of right-sided back pain, radiating down the left leg, which she described as feeling like her "back is breaking in half." (R. at 2036.) She reported having a compression fracture of the L1 vertebra in 2006. (R. at 2036.) Collier stated she was swimming and kayaking about a week and a half previously when she began having some muscle spasms, which eventually progressed to constant, sharp pains across her back, radiating into the left leg. (R. at 2036.) Her blood pressure was 122/80, and a physical examination was normal, except for decreased range of motion and pain of the lumbar back. (R. at 2039-40.) Dr. Burns diagnosed acute, right-sided low back pain with left-sided sciatica, she prescribed Voltaren and Flexeril, and she ordered lumbar x-rays. (R. at 2041.) She advised stretching, muscle rubs and heat. (R. at 2041.)

On September 15, 2020, Collier reported having one seizure since her last visit, noting Trileptal helped. (R. at 2042.) She stated her low back pain was doing "ok" and that she had taken some Flexeril with relief. (R. at 2042.) Although she had x-rays performed, Dr. Burns did not have them available for review. (R. at 2042, 2048.) Collier reported she needed something prescribed for her GERD, as Zantac had been recalled. (R. at 2042.) Her blood pressure was 120/80, and a physical

examination was normal, including normal range of motion with no tenderness, deformity or edema. (R. at 2046.) Collier's sodium level was slightly low that day, and her Trileptal dosage was adjusted. (R. at 2048.) Dr. Burns advised her to continue conservative management of her back pain, and she prescribed Pepcid for her GERD. (R. at 2048.) On October 13, 2020, Collier complained of hot flashes. (R. at 2052.) Her blood pressure was 130/70, and a physical examination was completely normal, but blood work showed a critically low potassium level of 2.9. (R. at 2053, 2055.) Collier was advised to take potassium chloride. (R. at 2055.) On December 15, 2020, Collier reported having a seizure three nights previously, with one a month before that. (R. at 2056.) She also reported some dizziness, especially when looking up and with head movement. (R. at 2056.) Collier was taking her Trileptal as prescribed. (R. at 2056.) Her blood pressure was low, at 90/60. (R. at 2056, 2060.) Otherwise, her examination was completely normal. (R. at 2060.) Due to new/worsening seizure activity, Dr. Burns referred Collier to neurology, and she continued her medications. (R. at 2062.) Collier's sodium level was low at 122, and she was advised to increase her salt and restrict her fluid intake. (R. at 1062-63.)

On January 28, 2021, Collier reported having seizures about every other week. (R. at 2063.) She reported salting her food, but she requested sodium tablets. (R. at 2063.) Collier advised she had been feeling fatigued and falling asleep easily. (R. at 2063.) She said her neurology referral had been approved, and she still needed to schedule the appointment. (R. at 2063.) Collier reported increased anxiety, despite taking Prozac, Seroquel and Abilify, noting she was helping to care for her daughter and newborn grandson who were living with her. (R. at 2064.) She also stated her other young daughter was pregnant. (R. at 2064.) Collier's blood pressure was somewhat low at 92/60. (R. at 2064, 2067.) A physical examination was normal, except Collier appeared fatigued. (R. at 2067-68.) Dr. Burns strongly advised her to schedule the neurology appointment for further evaluation of her seizure disorder.

(R. at 2071.) Until then, Collier was advised to continue her current seizure medication regimen, and her sodium level was checked, which was low at 125. (R. at 2069, 2071.) Buspar was added for Collier's anxiety, her Cozaar dosage was decreased, and Metoprolol was changed to Toprol XL. (R. at 2071.) On February 25, 2021, Collier reported worsening seizure activity, despite medication compliance, noting she had a "bad" one two days previously, after which she lost her grip in her left hand. (R. at 2072.) She was worried she had suffered a slight stroke. (R. at 2072.) She stated her sodium level remained low at 125 at her last appointment, despite taking sodium chloride tablets and salting her food. (R. at 2072.) Collier stated she had an upcoming visit with a neurologist on March 5. (R. at 2072.) Dr. Burns noted Collier was having seizures about once weekly. (R. at 2072.) Collier's blood pressure was 142/88, and her physical examination was normal, except for decreased sensation in the toes of the left foot and decreased grip strength in the right hand.[14] (R. at 2075-76.) Dr. Burns continued Collier's current seizure medication regimen, pending her upcoming neurology evaluation, and lab work was performed to check her sodium level. (R. at 2077.) She advised Collier to go to the emergency department for a head CT to rule out new damage in light of her neurologic deficit. (R. at 2077.)

On February 26, 2021, Collier presented to the emergency department at Norton Community Hospital after awakening with a seizure, which was witnessed by her fiancé. (R. at 1907.) Collier reported a history of weekly seizures. (R. at 1912.) She stated she was having left hand weakness and numbness in her left toes, as well as a significant headache and right-sided visual field deficit. (R. at 1907, 1912.) A physical examination was normal, except for weakness in the left upper and lower extremities. (R. at 1909.) After diagnostic testing was performed, it was determined

---

[14] The court questions whether this is a typographical error, as Collier's complaints of weakness related to her left hand.

that the seizure was a late effect of a cerebrovascular accident, ("CVA"), due to bilateral embolism of the middle cerebral arteries. (R. at 1925.) The following day, Collier continued to have left hand deficits, but, otherwise, was safe with mobility and ambulation. (R. at 1926.) She was discharged in fair condition to Holston Valley for a cardiology evaluation. (R. at 1931.) Upon transfer, a physical examination showed mild left upper extremity weakness, with strength of 4/5, right-sided visual field deficit, but intact sensation. (R. at 1953.) Otherwise, findings were normal. (R. at 1952.) Collier was admitted to the cardiac step-down unit and placed on telemetry monitoring. (R. at 1954-55.) After a transesophageal echocardiogram was normal, (R. at 1998-99), a loop recorder[15] was successfully implanted on March 1, 2021, to monitor for any cardiac rhythm problems. (R. at 1956, 1994.) Collier was discharged that same day in good condition. (R. at 1959.) At that time, she denied any weakness in the arms or legs, and she was doing "much better." (R. at 1956.) On examination, she was alert and cooperative; she had a regular heart rate and rhythm; her extremities were normal, without trauma, cyanosis or edema; pulses were 2+ and symmetric; and neurologic exam was grossly normal. (R. at 1956.) Her discharge diagnoses included acute cortical infarct, likely secondary to embolic event; seizure disorder, no recurrence; right lower extremity fifth toe bluish discoloration, improved; and hypokalemia, resolved. (R. at 1956.) Collier was discharged on dual anti-platelet therapy with aspirin and Plavix, as well as atorvastatin, and a follow up with neurology and hematology was recommended. (R. at 1956.) She also was prescribed Keppra, in addition to Trileptal. (R. at 1956.)

---

[15] An implantable loop recorder, or ILR, is a heart recording device that is implanted in the body underneath the skin of the chest. Its most common use is to look for causes of fainting, palpitations, very fast or slow heartbeats and hidden heart rhythms that can cause strokes. An ILR works as an electrocardiogram, continuously picking up electrical signal from your heart. An ILR can record heart rhythm for up to three years. *See* https://hopkinsmedicine.org/health/treatment-tests-and-therapies/loop-recorder-implantation (last visited Feb. 6, 2023).

Collier saw Claudia Corradino, A.P.N. at Ballad Health Medical Associates, on March 5, 2021, to establish neurologic care for seizures and a recent stroke. (R. at 2012.) She stated she began having seizures in 2006 and was told they were due to a "torn nerve" in her face. (R. at 2012.) She reported taking Trileptal and Neurontin, and the longest she had gone without having a seizure was six months.[16] (R. at 2012.) Collier told Corradino that, recently, she had been having one seizure weekly, which her fiancé described as tensing of the arms and legs for about a minute, after which she would be sleepy, but oriented. (R. at 2012.) Other times, she simply would be unable to rise from the couch, and her arms and legs would jerk. (R. at 2012.) It was noted that Collier had not had a seizure since starting Keppra, and she was undergoing occupational therapy for "weak" and clumsy left hand. (R. at 2012.) Collier reported restless legs, despite taking Seroquel. (R. at 2012.) A physical examination was normal. (R. at 2015-16.) Corradino diagnosed partial symptomatic epilepsy and restless leg syndrome, and she prescribed Requip. (R. at 2019-20.)

On March 24, 2021, Collier saw Dr. Nicholas A Cook, M.D., an oncologist/hematologist at the Southwest Virginia Cancer Center for a consultation. (R. at 2116.) Dr. Cook noted Collier's loop recorder had not shown any valvular disease or dysrhythmias. (R. at 2116.) Although Collier had a strong familial history of arterial disease, no venous thromboembolism was noted, and her hypercoagulable panel was negative. (R. at 2116.) Dr. Cook agreed with her current treatment with acetylsalicylic acid, ("ASA"), and Plavix, and he noted better seizure control with Keppra. (R. at 2116.) Collier's blood pressure was 144/67, and a physical examination was normal, except for abnormal reflexes, abnormal muscle tone and abnormal coordination. (R. at 2119-20.) Collier's sodium level was normal at 138,

---

[16] During an emergency department visit in January 2020, Collier reported that her most recent stroke had been more than one year previously. (R. at 1034.)

but her potassium level was low at 3.4. (R. at 2121.) Dr. Cook recommended Collier continue ASA and Plavix. (R. at 2122.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its

judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Collier argues the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Specifically, Collier argues the ALJ erred in his consideration of the opinion evidence. (Plaintiff's Brief at 5.) Collier also argues the ALJ erred by failing to give finality to a prior ALJ decision, which found she was limited to a range of sedentary work. (Plaintiff's Brief at 6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 416.920c(a) (2021) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any

medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[17]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 416.920c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 416.920c(b)(1) (2021).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 416.920c(b)(2) (2021).[18] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective

---

[17] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2) (2021). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 416.913(a)(5) (2021).

[18] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(2).

medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 416.920c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 416.920c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 416.920c(b)(2)-(3) (2021).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 416.920c(b)(3), (c)(3)-(5).

Collier argues the ALJ erred by improperly determining her residual functional capacity, in particular, by improperly considering the opinion evidence. However, for the reasons that follow, I am not persuaded by Collier's argument, and

I find that substantial evidence supports the ALJ's consideration of the opinion evidence and ultimate residual functional capacity finding. A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 416.945(a) (2021). The ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 416.946(c) (2021); *see also* 20 C.F.R. § 416.927(d)(2) (2021) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner).

First, with regard to Collier's physical residual functional capacity, she argues the ALJ erred by according more persuasive value to the opinion of state agency physician, Dr. McGuffin, than to that of Dr. Burns, her treating physician. In a March 3, 2021, physical assessment, Dr. Burns found Collier could lift/carry only three pounds occasionally and two pounds frequently; stand/walk a total of only one hour in an eight-hour workday and for five minutes without interruption; sit a total of four hours in an eight-hour workday, but for one hour without interruption; occasionally balance; never climb, stoop, kneel, crouch or crawl; her ability to reach, to handle, to feel, to push/pull and to see were affected by her impairment; she was unable to tolerate heights, moving machinery, temperature extremes, chemicals, dust, fumes and humidity; and she would miss more than two workdays monthly. (R. at 2005-07.) Dr. Burns stated these restrictions were due to Collier's recent stroke resulting in weakness in grip strength, as well as Collier's chronic obstructive pulmonary disease, ("COPD"). (R. at 2005-07.) In his decision, the ALJ found Dr. Burns's opinion "partially persuasive," noting she supported her opinions with a firsthand examination of Collier and that some of the physical restrictions she imposed were based on a CVA in early 2021. (R. at 25.) The ALJ also acknowledged that, during the time Collier experienced this CVA, her symptoms may have been more pronounced than previously. (R. at 25.) Therefore, he found Dr. Burns's restriction from concentrated exposure to atmospheric conditions persuasive. (R. at 25.)

Otherwise, however, the ALJ found the residual functional capacity evaluations of the state agency medical consultants more persuasive. (R. at 26.) In particular, the ALJ stated he was giving "great persuasive value" to the July 16, 2020, evaluation by state agency physician, Dr. McGuffin, who found Collier could perform a reduced range of light work, including no climbing of ladders, ropes and scaffolds and have no concentrated exposure to atmospheric conditions, hazards and heights; and she could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 25.) The ALJ found Dr. McGuffin's opinion was consistent with the evidence, including the later records submitted after the time Dr. McGuffin rendered his findings. (R. at 25.)

The court finds substantial evidence supports the ALJ's consideration of this opinion evidence. Dr. Burns treated Collier from late 2019 through February 2021. Over this time, the vast majority of her physical examinations of Collier were normal or reflected mildly abnormal findings, such as decreased range of motion and pain of the lumbar back. While Collier's examinations reflected some additional findings around the time of her CVA in February 2021, including decreased sensation in the toes of the left foot, decreased grip strength and mild left upper and lower extremity weakness, by March 1, 2021, Collier reported doing much better, she denied weakness in her arms and legs, and a neurologic examination was grossly intact. Although the treatment records show an uptick in Collier's seizure activity for a short period of time – beginning in approximately June 2020 – this was due to her need to stop Trileptal, one of her seizure medications, due to developing hyponatremia. After experiencing a CVA in February 2021 and being prescribed Keppra, the treatment notes indicate Collier's seizure activity was, once again, controlled. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.").

Additionally, the court notes that, under the regulations, the ALJ was entitled to rely on the state agency physician's assessment. *See* 20 C.F.R. § 416.913a(3)(b)(1) (2021) ("State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."). Furthermore, with regard to Collier's argument that the opinions of the state agency consultants are "stale [and] outdated," the simple fact that an opinion came later in time than the state agency opinions does not mean it is more persuasive. As the Third Circuit has noted, "[B]ecause state agency review precedes ALJ review there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *see also Stricker v. Colvin*, 2016 WL 543216, at *3 (N.D. W. Va. Feb. 10, 2016) ("[A] lapse of time between State agency physician opinions and the ALJ's decision does not render the opinion stale."). It is apparent from the ALJ's opinion that he evaluated the whole record before him when making his residual functional capacity finding.

Lastly, the court also notes Collier reported performing activities that support the ALJ's consideration of the opinion evidence. For instance, in a June 2020 Function Report, Collier stated she prepared "big meals" a couple of times weekly, she could do most of the indoor chores, she could walk up to a quarter-mile at a time, she crocheted on good days and she worked puzzles. (R. at 262-69.) In various mental health and medical treatment notes from September 2018 to January 2021, Collier reported engaging in the following activities: camping, picking and selling mushrooms, hiking, spending a lot of time outdoors, biking, fishing, looking for herbs, working outside, kayaking, swimming, crocheting and helping to care for her daughter and newborn grandson, who were living with her. The regulations allow an

ALJ to consider a claimant's activities of living in evaluating her allegations. *See* 20
C.F.R. § 416.929(c)(3)(i) (2021).

With regard to her mental residual functional capacity, Collier also argues the
ALJ erred by finding Dr. Burns's March 2021 mental assessment "partially
persuasive," while finding the opinions of state agency psychologists Carne and
Leizer "generally persuasive." (R. at 25-26.) Dr. Burns opined, among other things,
that Collier was markedly limited in her ability to deal with the public, to behave in
an emotionally stable manner and to relate predictably in social situations, and she
had no useful ability to deal with work stresses. She opined Collier would be absent
from work more than two days monthly. On February 15, 2020, state agency
psychologist Carne opined, among other things, that Collier could perform at least
one- to two-step commands in low-stress environments, with occasional contact with
the public and with co-workers. On July 16, 2020, state agency psychologist Leizer
opined, similarly, that, while Collier's ability to understand and remember complex
or detailed instructions was limited, she would be expected to understand and
remember simple one- and two-step instructions. Leizer found that Collier was
capable of performing simple, and some detailed, instructions; she could maintain
attention and concentration during the day with normal breaks; she could persist at
simple tasks for two-hour blocks to complete a normal workday and workweek; she
could ask simple questions and maintain appropriate hygiene; she could engage in
brief, superficial interactions with the public, co-workers and supervisors; she could
set goals and be aware of hazards; and she could adjust to occasional changes in
work setting and procedures.

With regard to Dr. Burns's opinion, the ALJ noted she was able to support it
with a firsthand examination of Collier. (R. at 25.) However, the ALJ correctly stated
that Dr. Burns is not a mental health professional, and there is very little information

in her treatment notes to support such considerable restrictions. (R. at 26.) In particular, the court notes that Dr. Burns's treatment notes repeatedly reflect, from late 2019 through February 2021, just one month prior to her assessment, that Collier was alert and fully oriented, with a normal mood, affect, behavior, judgment and thought content. Although Collier reported being nervous/anxious in January 2020, she reported increased stress at home, and her mental status examination remained completely normal. On February 6, 2020, Collier advised Dr. Burns she had been very emotional since stopping Trileptal, but her mental status examination was, again, normal. Later that month, Collier advised Dr. Burns her mood was good, and her mental status was normal. Dr. Burns deemed Collier's bipolar disorder stable at that time. Collier continued treating with Dr. Burns through February 2021, over which time, her mental status reflected completely normal findings.

Likewise, the treatment notes from other providers reflect normal or minimal mental health findings. For instance, despite a lengthy history of mental health issues, including hospitalizations for suicidal ideations and attempts, Collier's conditions have stabilized. Her diagnoses include major depressive disorder; bipolar disorder; personality disorder; and generalized anxiety disorder, but her most recent hospitalization was in June 2018. Relevant treatment notes from Frontier Health reflect family stressors, but normal mental status findings, except for an anxious or varied mood with a congruent affect, on occasion. She denied suicidal ideation. Upon discharge from a hospitalization for hyponatremia in February 2020, Collier had normal speech, linear thoughts and good eye contact. Later that month, when she saw Dr. Beasey, she denied anxiety and depression, and she was alert and fully oriented.

With regard to the opinions of Carne and Leizer, the ALJ stated they both supported their opinions with examples from Collier's mental health records, which

indicated depression, bipolar disorder and anxiety. (R. at 25.) The ALJ further stated he had considered Collier's situational stressors related to family members, as well as a "plethora" of missed appointments, in limiting her from public interaction and to only superficial interaction with co-workers and supervisors. (R. at 25.) The ALJ, nonetheless, stated Collier was not precluded from performing simple, routine, repetitive tasks. (R. at 25.) As noted above, the majority of treatment notes, including those from Dr. Burns, reflect largely normal mental status findings and that Collier's mental health condition was stable during the time relevant to her current claim.

For all these reasons, I find that substantial evidence supports the ALJ's consideration of the opinion evidence, as well as his resulting residual functional capacity finding.

Lastly, Collier argues the ALJ erred by improperly considering the prior ALJ's decision and finding her condition improved, so as to reject the prior finding that she had a residual functional capacity for a reduced range of sedentary[19] work. (R. at 86.) The current ALJ found that Collier has the residual functional capacity to perform a reduced range of light work. (R. at 21.) In accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same … title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at

---

[19] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2021).

*1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473 (4th Cir. 1999). Those standards have been superseded by 20 C.F.R. § 416.920c, which prescribes how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright*. *See* Program Operations Manual System, ("POMS"), DI 24503.005 available at https://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 1, 2021) (explaining the categories of evidence).

Here, the ALJ noted he reviewed the previous 2018 decision and found it to be "unpersuasive." (R. at 26.) The ALJ noted that, while the 2018 decision limited Collier to a reduced range of sedentary work, her conditions had improved since that time. He specifically noted recent examinations revealing no gait disturbance and normal strength, sensation and range of motion. (R. at 26.) The ALJ concluded that the 2018 decision was not supported by recent evidence and was inconsistent therewith. (R. at 26.) In particular, as stated above, Collier's examinations were largely normal, except for rather mild findings, including intermittent decreased range of motion, tenderness and pain in the lumbar back, one notation of mild bilateral leg swelling, one mention of decreased sensation in the toes on the left foot, as well as decreased grip strength and some weakness in the left upper and lower extremities and, most recently, some abnormal reflexes, muscle tone and coordination immediately following a CVA. Additionally, the court notes that Collier's sole treatment for back pain during the current period of review consisted of conservative measures, including medication management. She did not complain of back pain until August 2020, and by September 2020, she stated it was doing "ok," and that Flexeril provided relief. Likewise, Collier's seizures were treated with

various medications, including Trileptal, gabapentin and Keppra. Although Trileptal had to be discontinued, and later restarted at a lower dosage, due to her issues with hyponatremia, as discussed above, the record indicates that there was only a rather short period of time during which Collier's seizure activity increased before it was, once again, controlled with medication. *See Gross*, 785 F.2d at 1166. Lastly, I find that Collier's activities, enumerated herein, that support the ALJ's consideration of the opinion evidence, also support a finding of medical improvement since the prior ALJ's decision.

For the above-stated reasons, I find that the ALJ properly considered the prior ALJ's decision, and his determination that it is unpersuasive is supported by substantial evidence. I, likewise, find his deviation from the prior residual functional capacity finding also is supported by substantial evidence, as is his ultimate residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding;
2. Substantial evidence exists in the record to support the ALJ's consideration of the prior ALJ's decision; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Collier was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Collier's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     February 17, 2023.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-35-